# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 97-DP-00427-SCT

*TERRY RAY SMITH*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/3/96 |
| TRIAL JUDGE: | HON. GRAY EVANS |
| COURT FROM WHICH APPEALED: | LEFLORE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | WILLIE J. PERKINS, SR. |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LESLIE S. LEE |
| DISTRICT ATTORNEY: | FRANK CARLTON |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - DIRECT APPEAL |
| DISPOSITION: | REVERSED AND REMANDED - 2/25/99 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 4/12/99 |

**EN BANC.**

**SMITH, JUSTICE, FOR THE COURT:**

¶1. Terry Ray Smith was indicted by the Grand Jury of the Circuit Court of Leflore County and convicted of the capital murder of Theodore Thompson during the commission of an arson, the murder of Laura Wells and the murder of Darren Wells on February 16, 1995. This case comes to this Court on appeal by Smith where Smith was convicted of Count I- Capital Murder, Count II - Murder, and Count III - Murder. Smith received the death penalty by a jury for Count I.

¶2. It is from this judgment and sentence that Smith brings this appeal. Smith raises the following assignments of error:

**I. WHETHER THE PROSECUTOR USED PEREMPTORY CHALLENGES IN A RACIALLY DISCRIMINATORY WAY IN VIOLATION OF THE FEDERAL AND STATE CONSTITUTIONS AND STATE LAW.**

**II. WHETHER THE STATE VIOLATED RULE 4.06**

**III. WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY**

ADMITTING ILLEGAL TESTIMONY AND EVIDENCE.

IV. WHETHER THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO PRECLUDE ADMISSION OF GRUESOME AND HIGHLY PREJUDICIAL COLOR PHOTOGRAPHS OF THE DECEASED AND IN ALLOWING THE SAME TO BE ADMITTED AS EVIDENCE DURING THE GUILT AND SENTENCING PHASES OF TRIAL.

V. WHETHER THE TRIAL COURT ERRED IN ALLOWING TESTIMONY OF THE CHILD WITNESS.

VI. WHETHER THE TRIAL COURT ERRED BY ALLOWING THE STATE TO LEAD THE CHILD WITNESS.

VII. WHETHER THE TRIAL COURT ERRED BY ADMITTING THE HEARSAY TESTIMONY OF THE CHILD WITNESS.

VIII. WHETHER THE ACTION OF THE TRIAL COURT IN LEAVING THE BENCH AND CONSULTING THE VICTIM'S SON IN THE PRESENCE OF THE JURY WAS PREJUDICIAL AND INFLAMMATORY AND DENIED THE APPELLANT A FAIR TRIAL.

IX. WHETHER THE TRIAL COURT ERRED IN LIMITING CROSS-EXAMINATION OF THE JAILHOUSE CONFESSION WITNESS.

X. WHETHER THE TRIAL COURT ERRED IN REFUSING TO GRANT CIRCUMSTANTIAL EVIDENCE INSTRUCTIONS.

XI. WHETHER THE TRIAL COURT ERRED IN ITS REFUSAL OF JURY INSTRUCTIONS D-14, D-15, D-18, D-12, D-20 & D-29 DURING THE GUILT PHASE OF THE TRIAL.

XII. WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN GRANTING JURY INSTRUCTIONS C-CR-3 AND REFUSING JURY INSTRUCTIONS D-11, D-12 & D-13 WHICH ALLOWED THE JURY TO CONSIDER THE LESSER INCLUDED OFFENSE.

XIII. WHETHER THE STATE VIOLATED RULE 609, MISSISSIPPI RULES OF EVIDENCE AND THE TRIAL COURT ERRED IN ALLOWING EVIDENCE OF AN EIGHTEEN (18) YEAR OLD CONVICTION OF UTTERING FORGERY DURING THE SENTENCING PHASE.

XIV. WHETHER APPELLANT WAS DEPRIVED OF HIS RIGHT TO PRESENT RELEVANT MITIGATION EVIDENCE BY THE TRIAL COURT'S ERRONEOUS EVIDENTIARY RULING.

XV. WHETHER THE TRIAL COURT ERRED IN ITS PARTIAL DENIAL OF APPELLANT'S MOTION FOR COOLING OFF PERIOD BETWEEN CONCLUSION OF GUILT-INNOCENCE PHASE AND BEGINNING OF POSSIBLE SENTENCE PHASE OF APPELLANT'S CAPITAL MURDER TRIAL.

**XVI. WHETHER THE PROSECUTOR'S IMPROPER COMMENTS AND MISCONDUCT DEPRIVED APPELLANT OF A FAIR TRIAL.**

**XVII. WHETHER THE TRIAL COURT ERRED IN INSTRUCTING THE JURY IN SUCH A WAY AS TO RELIEVE THE STATE OF ITS BURDEN OF PROVING THAT THE AGGRAVATING CIRCUMSTANCES OUTWEIGH THE MITIGATING CIRCUMSTANCES AND PEREMPTORILY INSTRUCTING THE JURY TO FIND ARSON AS AN AGGRAVATING CIRCUMSTANCE.**

**XVIII. WHETHER THE GRANTING OF SENTENCING INSTRUCTION C-S-1 IN CONJUNCTION WITH REFUSAL TO GRANT SENTENCING INSTRUCTION D-32 ACTED AS A LIMIT ON THE PRESENTATION OF MITIGATION EVIDENCE IN VIOLATION OF THE STATE AND FEDERAL CONSTITUTIONS.**

**XIX. WHETHER THE TRIAL COURT ERRED IN SUBMITTING THE "ESPECIALLY HEINOUS, ATROCIOUS OR CRUEL" AGGRAVATING CIRCUMSTANCE.**

**XX. WHETHER SENTENCING INSTRUCTION C-S-1 WAS DEFECTIVE IN A MANNER WHICH VIOLATES STATE LAW AND THE EIGHTH AMENDMENT.**

**XXI. WHETHER THE TRIAL COURT VIOLATED THE EIGHTH AMENDMENT AND STATE LAW BY INSTRUCTING THE JURY TO DISREGARD SYMPATHY OR MERCY IN REACHING ITS SENTENCING DECISION.**

**XXII. WHETHER THE TRIAL COURT ERRED IN DENYING APPELLANT'S PEREMPTORY INSTRUCTIONS, MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT (JNOV) OR IN THE ALTERNATIVE FOR A NEW TRIAL.**

**XXIII. WHETHER THE VERDICT IS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.**

**XXIV. WHETHER THE TRIAL COURT ERRED IN ITS DENIAL OF APPELLANT'S MOTION TO DECLARE MISS. CODE ANN. SECTION 97-3-19(2)(E) UNCONSTITUTIONAL; OR, IN THE ALTERNATIVE, TO PRECLUDE THE PROSECUTION FROM RELYING ON MISS. CODE ANN. SECTION 99-19-101(50)(D) AS AN AGGRAVATING CIRCUMSTANCE AT APPELLANT'S CAPITAL SENTENCING TRIAL.**

**XXV. WHETHER THE DEATH SENTENCE IS DISPROPORTIONATE IN THIS CASE CONSIDERING THE UNIQUE CHARACTERISTICS.**

**XXVI. WHETHER THE AGGREGATE ERROR IN THIS CASE REQUIRES REVERSAL OF THE CONVICTION AND DEATH SENTENCE.**

¶3. This Court, after extensive examination of the record and all issues raised by Smith, finds that Issues VI, VII and IX warrant discussion. We hold that Issues VII and IX are meritorious and therefore we reverse the circuit court's judgment and remand for a new trial.

## FACTS

¶4. On February 16, 1995, the apartment of Darren and Laura Wells was burned by fire. The apartment was located in Leflore County, Mississippi. Darren Wells' body was found on the outside in his truck with a gunshot wound to the back of the neck. There were notable bruises and minor cuts which indicated that Darren had been in a struggle with someone. The bodies of Laura Wells and one of her children, Theodore Thompson Wells ("Teddy") were found inside the charred remains of the apartment. Laura died from a gunshot wound to the head. Teddy died from smoke inhalation. Two other children, T. J. Rogers and Devin, survived the fire. The fire was started by kerosene from a broken lamp.

¶5. Terry Ray Smith had previously lived with the Wellses until a dispute occurred around December 24, 1994 when Smith was escorted from the apartment by Deputy Art Langley. According to Deputy Langley, Smith stated that he would just kill them and burn their house down.

¶6. Smith lived with Mary Fay Christina Reynolds and her mother after he was kicked out of the Wellses apartment. Testimony revealed that Smith had previously had a sexual relationship with Laura Wells and wanted to pursue another relationship with her. Additionally, testimony revealed that Smith told Mary Fay's stepfather that he would get back at Darren and Laura Wells. Smith also told Mary Fay that he had a 9mm gun for a certain person and when he was finished with it, he would throw it in a river.

¶7. Smith was indicted by the Grand Jury of the Circuit Court of Leflore County on February 1, 1996, for the capital murder of Theodore Thompson during the commission of an arson, the murder of Laura Wells and the murder of Darren Wells and was subsequently convicted of convicted of Count I- Capital Murder, Count II - Murder, and Count III - Murder. Smith received the death penalty by a jury for Count I.

## DISCUSSION

**VI. WHETHER THE TRIAL COURT ERRED BY ALLOWING THE STATE TO LEAD THE CHILD WITNESS.**

**AND**

**VII. WHETHER THE TRIAL COURT ERRED BY ADMITTING HEARSAY TESTIMONY OF THE CHILD WITNESS.**

¶8. Smith contends that the trial court erred in allowing the State to lead the child witness. Smith argues that the State led the child witness to such an extent that it was the State giving testimony and not the child. Smith offers the following excerpts from the trial to support his argument:

Q. Do you remember the night that the house burned up?

A. Yes.

Q. Do you remember that your mother and her husband had a fuss, and he was sleeping in the truck? Do you remember that?

A. Yes.

Q. Did he tell you anything about what happened right before the fire started?

A. Uh - my brother?

Q. Uh -Huh.

A. No.

Q. Did he tell you about seeing somebody in the house?

A. He told me about seeing somebody in the house.

¶9. Smith offers Rule 611, Miss. Rules of Evidence which provides that the use of leading questions on direct examination should be limited to circumstances where necessary to develop the witness' testimony. Smith cites **Thompson v. State**, 468 So. 2d 852 (Miss. 1985) for the proposition that "This Court has cautioned against the continued use of leading questions on cogent points, with a child witness, but this admonition was based on the combination of leading questions on direct, witness equivocation on cross, and subsequent reconstitution of the witness via questions from the bench. **Id.** at 853-54.

¶10. Smith argues that the trial court abused its discretion in allowing the continued use of leading questions on cogent points.

¶11. The M.R.E. 611 provides that the use of leading questions on direct examination should be limited to circumstances where necessary to develop the witness' testimony. However, here, we hold that the "classic example" of a situation ripe for leading questions on direct is where the witness is a child. **Eakes v. State**, 665 So. 2d 852, 869 (Miss. 1995) (citing **Jones v. State**, 606 So. 2d 1051, 1059 (Miss. 1992). "Children are a classic example of the kinds of witnesses for whom leading questions may be necessary." **Ivy v. State**, 522 So. 2d 740, 742 (Miss. 1988). (citing 3 Weinstein's Evidence, para. 611[05] (1987)).

¶12. The trial court allowed some leeway in leading because of the tender years of the child witness. In this case, we find that the trial judge did not abuse his discretion in allowing the State to lead this child witness to develop his testimony.

¶13. Smith's next assignment of error is that the lower court erred in the allowance of hearsay testimony of T.J. Rogers. Also, Smith argues that the statements were inadmissible because the declarant, Devin was not present at trial.

¶14. During trial the following took place in an effort to elicit testimony about what T.J. Rogers was told by his younger brother, Devin:

Q. Uh-huh. Did he tell you anything about what happened right before the fire started?

A. Uh - my brother?

Q. Uh-huh.

A. No.

Q. Did he tell you about seeing somebody in the house?

A. He told me about seeing somebody in the house.

Q. Who did he say it was?

**By Mr. Perkins:** I'm going to object to the leading; hearsay.

**By Mr. Carlton:** Well, Your Honor===

**By The Court:** Ya'll step up here.

**By Mr. Carlton:** I don't think he can say the name.

**By The Court:** Huh?

**By Mr. Carlton:** I don't think he can say the name.

**By Mr. Perkins:** I think its hearsay.

**By The Court:** Well, you've almost got excitement; not quite. I don't know where you're there or not.

**By Mr. Carlton:** A six year old's mother being burned when he raised up? If that's not excitement, what is? I think that's exactly what it is.

**By The Court:** What have you got?

**By Mrs Bridges:** Rule 803.2, Your Honor.

**By The Court:** Let me look at it.

**By The Court:** Come up here Frank.

**By The Court:** Now, as I understand it, he has testified that when he woke up, the fire was going?

**By Mr. Carlton:** That's right.

**By The Court:** I'm going to allow the question.

**By The Court:** Objection is overruled.

T.J. Rogers was also allowed to testify that his brother told him what the person was wearing.

¶15. The State argues that the trial court correctly found the statements admissible under either the present sense impression or excited utterance exception to the hearsay rule. However, in the record, the trial judge allowed the statement in under Rule 803(2) of the Mississippi Rules of Evidence. The State contends that the declarant, Devin, was clearly under the stress of the excitement caused by the fire; the inability to retrieve his baby brother while he was burning alive, the discovery of his parents, and the injuries he personally sustained. Further the State urges this Court to follow its holding in *Berry v. State*, 611 So. 2d 924 (Miss. 1992) where this Court held that Kelly Berry's statements qualified as present sense impression or an excited utterance because the statement was made at Kelly Berry's first known opportunity to the first person he saw after the shooting. Kelly Berry made the statement at his first and only known time of consciousness to the first and only person he saw, James Berry. There was nothing in the record to suggest that the statement was not spontaneous. *Berry* 611 So. 2d at 926. The State also contends that the

allegation that Devin's statements are inadmissible because he was not present is without merit. According to the State under Rule 804(a)(6) a declarant is unavailable if "in the case of a child, there is the substantial likelihood that the emotional or psychological health of the witness would be substantially impaired if the child had to testify in the physical presence of the accused." *Quimby v. State*, 604 So. 2d 741, 748 (Miss. 1992).

¶16. In this case objection to the testimony was overruled by the trial judge and the testimony was allowed as an "excited utterance" exception to the hearsay rule under Rule 803(2) of the Mississippi Rules of Evidence.

¶17. Devin made a statement to T.J. Rogers that he "saw a man with long ole hair" in the house. Devin mentioned something about a cap and that it was black with a red bottom. Admittedly this is hearsay, but whether it falls under the "excited utterance" exception must be analyzed.

¶18. Rule 803(2) defines an excited utterance as "a statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Although the rule sets no specific time limit, nevertheless, under our precedent case law, this Court has not allowed the admission of an excited utterance exception when the time frame was more than twenty-four hours. *Heflin v. State*, 643 So. 2d 512, 519 (Miss. 1994). The comment to Rule 803(2), further explains:

> that the underlying theory of the excited utterance exception is that circumstances may create such an excited condition that the capacity for reflection is temporarily impeded and that statements uttered in that condition are thus free of conscious fabrication. The essential ingredient is spontaneity. With respect to time element, the issue is the duration of the excited state. This depending on the exact circumstances of a case, vary greatly. The declarant need not be a participant but only an observer of the event which triggered the excitement. An excited utterance need only "relate" to the startling event, and therefore, the scope of the subject matter of the statement may be fairly broad.

¶19. When T.J. woke up the night of the fire, his brother Devon was screaming. Both were scared. Both saw their mother on the bed with her hand leaning over the edge, while the fire was burning the bed. They were unable to get their other brother out of the house. Both boys escaped the fire and went to get in the truck where the body of Darren Wells was located. It is certainly not unreasonable to say that Devin was under the stress of the event when he told his brother about seeing someone inside the house with "long ole hair."

¶20. In *Owens v. State*, 716 So. 2d 534, 535-36 (Miss. 1998), the Court found that

> [a]n excited utterance is a "statement relating to a startling event or condition made while the declarant was under the stress of the excitement caused by the event or condition." M.R.E. 803(2). The reliability of an excited utterance is based on the premise that circumstances may place the declarant in such an excited state as to temporarily impede the capacity for reflection.

*Id.* (*quoting Clark v. State*, 693 So. 2d 927, 932 (Miss. 1997). The Court in *Clark* found that a woman's hysterical 911 call to the police while her estranged boyfriend was outside the door threatening to kill her with a shotgun qualified as an excited utterance under Rule 803(2) and was properly admitted. This Court has approved other instances of hearsay statements rendered admissible by this exception.

¶21. In *Davis v. State*, 611 So. 2d 906, 914 (Miss. 1992), this Court reiterated the principle that the

competency of an excited utterance is within the discretion of the trial court. In that case, the Court found no abuse of discretion where the trial judge allowed testimony by the victim's sister. *See also **Gill v. State***, 485 So. 2d 1047, 1050 (Miss. 1986).

¶22. In the case at bar, all of the required elements appear to be present to allow the admissibility of Devin's statement to T.J. as an excited utterance under Rule 803(2),with one exception. We note that in each of the above mentioned cases there was a time frame given as to when the statements were made so that the Court could determine the duration of the excited utterance and thus whether the statements were admissible under the hearsay exception. However, in the case *sub judice*, there is no evidence in the record to ascertain at what point after the fire Devin made the statement to T. J. which would allow this Court to find that the statement was admissible under the excited utterance exception to the hearsay rule. The record is simply devoid of any evidence whatsoever regarding when Devin made the statement to T.J. Thus, this Court is left to speculate regarding the duration of the excited utterance. We decline to so speculate. The State must supply those facts. Because of the absence of any supporting facts in this record as to when Devin made the statement to T.J., we hold that the trial court erred in allowing this testimony.

## IX. WHETHER THE TRIAL COURT ERRED IN LIMITING CROSS EXAMINATION OF THE JAILHOUSE CONFESSION WITNESS.

¶23. In his next assignment of error, Smith contends that the lower court erred in limiting his cross-examination of the State's witness, Joey Cornish. On direct examination, Cornish testified that, while he and Smith were in the Leflore County Jail, Smith told him that he killed Darren Wells and Laura Wells and poured coal oil on the bed and set it on fire. Cornish denied any agreement with the Sheriff in exchange for his testimony. Cornish admitted that twenty-one days after he gave the recorded statement to the Sheriff's Department he filed a petition to enter into the pretrial diversion program, which meant that if he didnot get into trouble for three years, his record would be clean.

¶24. Smith argues that Cornish admitted to committing fifteen auto burglaries and five grand larcenies. However, the State objected to this questioning, and the trial court sustained the objection. Smith contends that Cornish denied a deal with the State in exchange for his testimony, but his confession to thirty-two crimes and the State's election to prosecute only six and place him in a pre-trial diversion program, constituted an agreement.

¶25. Smith contends that the circuit court sustained the State's objection when Cornish was questioned about a drug problem and his mental problem and condition. Smith contends that Cornish told him he had dynamite in his bedroom and that he had a 9mm gun in his possession within the past year.

¶26. On redirect the State asked Cornish the following:

> Q. And after you entered the pretrial diversion program, did you commit more crimes?

> A. Yes, sir.

Smith argues that this opened the door for admissions of crimes committed by Cornish.

¶27. The trial court agreed to allow Smith to make a proffer on record which was had after the trial on October 7, 1996. During the proffer, Cornish again denied any agreement with the State, but admitted to his confession to thirty-two crimes and that he was indicted on six charges. Smith argues that if Cornish

were to receive the maximum sentence on all crimes committed, he would be in jail for the rest of his life.

¶28. Cornish admitted that he had been experiencing mental problems for 1½ to 2 years, and had been confined in a mental institution for thirty days; and received mental treatment at Life Help in Greenwood, Mississippi, since 1994.

¶29. Cornish testified that he shot up his house, tried to commit suicide and was admitted to Parkwood Hospital in Olive Branch in April, 1995. When he shot up his house, Deputy Sheriffs Bubba Golden and Arvill Burden came and took him into custody. Cornish testified that Arvill Burden was the same officer who took his statement about Smith.

¶30. In his brief, Smith cites M.R.E. 611(b) which provides that cross-examination shall not be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. He offers the commentary to that section which states that subsection (b) permits a wide-open cross-examination. Under this examination any matter may be probed that is relevant. Smith argues that during the trial, counsel attempted to illicit information from Cornish to attack his credibility; to show his bias and interest; to show that he had an agreement with the State or had been shown favoritism; to show Cornish suffered from a mental problem and to otherwise show that his testimony was not trustworthy. Smith contends that the jury never had an opportunity to learn the real Joey Cornish.

¶31. Further, Smith cites M.R.E. 606, which states "that the credibility of a witness may be attacked by any party..." Smith also relies on M.R.E. 608 (b) which states that:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness, or (2) concerning his character for truthfulness or untruthfulness of another or witness as to which character the witness being cross-examined has testified.

¶32. Smith argues that the trial court allowed Cornish to give hearsay statement of Smith concerning killing the Wellses and burning the apartment. Smith relies on *Wilcher v. State*, 697 So. 2d 1087, where this Court stated that:

> When hearsay testimony is admitted, M.R.E. 806 provides that "the credibility of the declarant may attacked, and if attacked may be supported by any evidence which would be admissible for those purposes if the declarant had testified as a witness." M.R.E. "Rule 806 has been read to allow impeachment of hearsay declarant's [sic] by the use of their previous convictions pursuant to Rule 609 of the Rules of Evidence." *Turner v. State,* 573 So. 2d 1335, 1339 (Miss. 1990) (citing *United States v. Newman*, 849 F. 2d 156, 161-63 (5th Cir. 1988)).

¶33. The State contends that Smith's counsel attempted to question about irrelevant matters, but the trial court correctly limited the cross examination of Cornish to those subjects which had bearing on the case sub judice. The State argues that the trial judge's ruling to limit cross-examination did not prejudice Smith. Further, the State contends that the purpose of eliciting testimony that Cornish had not been indicted on all his charges by the District Attorney was for the jury to infer Cornish's bias toward the State. The State argues that Smith's counsel was allowed to make an in depth argument about Cornish's alleged sweetheart

deal during closing statements.

¶34. M.R.E. 608 (b) provides:

> Specific instances of conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of a crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of a witness (1) concerning his character for truthfulness or untruthfulness,....

The rule provides discretionary authority for the trial judge to permit upon cross-examination inquiry into specific acts of misconduct of a witness "if probative of truthfulness or untruthfulness," and concerning a witness's character for "truthfulness or untruthfulness." ***Brent v. State***, 632 So. 2d 936, 943 (Miss. 1994). The comment to the rule notes that this exception goes beyond pre-rules decisions, and allows "impeachment by specific acts which are something other than criminal convictions when the character trait of truthfulness of the witness being examined is under attack." ***Id.***

¶35. Since Rule 608(b) comes verbatim from the Federal Rules of Evidence, this Court in ***Brent v. State***, looked to the federal courts' interpretation for guidance. ***Id.*** It is elementary that evidence offered for one purpose might be inadmissible, yet admissible when offered for another. ***Brent***, 632 So. 2d 936, 943 (Miss. 1994); M.R.E. 105; ***United States v. Abel***, 469 U.S. 45, 56 (1984); ***U.S. v. Martinez***, 962 F.2d 1161, 1165 (5th Cir. 1992); ***Lubbock Feed Lots v. Iowa Beef Processors, Inc.,*** 630 F.2d 250, 261 (5th Cir.) reh'g denied 634 F. 2d 1355 (5th Cir. 1980).

¶36. The question before this Court is: Under what circumstances may one cross-examine a witness under Rule 608(b) about specific instances of past conduct not resulting in a conviction when the sole purpose of such line of questioning is to destroy the witness's credibility for truthfulness? When will it be permitted, and what is its effect? 632 So.2d. at 943.

¶37. A witness on cross-examination may be interrogated regarding his interest, bias or prejudice in a case. ***Sayles v. State***, 552 So.2d 1383, 1385-86 (Miss. 1989); ***Hill v. State***, 512 So. 2d 883 (Miss. 1987). The scope of cross-examination, though ordinarily broad, is within the sound discretion of the trial court and the trial court, possesses inherent power to limit cross-examination to relevant matters. ***Pace v. State***, 473 So. 2d 167 (Miss. 1985); ***Dozier v. State,*** 257 So. 2d 857 (Miss. 1972).

¶38. To determine relevancy we must look at M.R.E. 403 which that "relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury..."

¶39. Smith's counsel attempted to impeach Cornish by delving into matters not resulting in convictions. The trial judge did not agree with counsel that the matters were relevant to the case at hand. However, the court allowed counsel to attempt to show whether there was bias or interest relating to a deal by the State. Also, the trial judge allowed an in depth argument about the alleged deal. We find that Smith was allowed adequate cross-examination regarding the alleged "deal."

¶40. However, the Cornish's drug problems and mental condition certainly were relevant on cross-examination. Smith's proffer is replete with information that Joey Cornish had been a mental patient, abused alcohol, drugs, sniffs gas and freon, that he was suicidal, that he was afraid of being in jail, has an explosive,

violent temper, and had attempted to kill members of his immediate family. This information, coupled with the fact that Cornish lived extremely close to the victims and in fact was at the scene of the fire that very night was clearly relevant for cross-examination. Even more significant was the fact that Cornish admitted that the cigarette lighter found in Darren Welsh's truck belonged to Cornish, and this evidence was not timely revealed to Smith's counsel. The jury should have heard this cross-examination testimony of Cornish.

¶41. Mississippi has afforded defense counsel wide latitude in cross-examination. *Nalls v. State,* 651 So. 2d 1074, 1076 (Miss. 1995); *Horne v. State*, 487 So. 2d 213 (Miss. 1986). Furthermore, "[t]he right of confrontation and cross-examination. . . extends to and includes the right to fully cross examine the witness on every material point relating to the issue to be determined that would have bearing on the credibility of the witness and the weight and worth of his testimony." *Id.* at 216 *(citing Myers v. State*, 296 So. 2d 695 (Miss. 1974).

¶42. Considering all of the above factors, defense counsel should have been afforded the opportunity to fully cross-examine Joey Cornish on every material point that would have bearing on his credibility which would necessarily include many of his past crimes, drug problems, mental condition, violent behavior, why he was at the fire that night, and more importantly his cigarette lighter being found in the victim's truck. The trial court erred by limiting defense counsel's cross examination of Cornish.

## CONCLUSION

¶43. We hold that Issue VI is without merit, but that the trial court erred regarding Issues VII and IX. This record is devoid of any evidence regarding when the younger child, Devin, made the statement to his older brother, T.J., after the fire so as to allow this Court to determine the duration of the excited utterance. Absent such facts, the trial court erred in admitting the statement.

¶44. Regarding the cross-examination of Cornish, we hold that the trial court erred in limiting such cross-examination. We therefore reverse and remand for a new trial.

¶45. **REVERSED AND REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**PRATHER, C.J., SULLIVAN AND PITTMAN, P.JJ., BANKS, ROBERTS, MILLS AND WALLER, JJ., CONCUR. McRAE, J., CONCURS IN RESULT ONLY.**